IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

_____

| | |
|---|---|
| Sustainable Sea Products International,<br>LLC, SSPI Mid-Atlantic LLC,<br>and<br>SSPI Real Estate Holdings LLC,<br><br>Plaintiffs,<br><br>v.<br>American Empire Surplus Lines Insurance<br>Company, and American Financial<br>Group, Inc.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.: 3:21cv697

_____

## **COMPLAINT**

The plaintiffs, Sustainable Sea Products International, LLC (SSP), SSPI International Mid-Atlantic LLC (SSPMA) and SSPI Real Estate Holdings LLC (SSPRE, collectively with SSP and SSPMA referenced as SSPI) for their complaint against the defendants American Empire Surplus Lines Insurance Company (AESLIC) and American Financial Group, Inc. d/b/a Great American Insurance Group (GA) state as follows:

### **INTRODUCTION**

1.      Through this Complaint, the SSPI plaintiffs allege breach of contract, bad faith, and violations of Virginia law governing insurance claims practices against AESLIC a surplus lines property insurer, and GA, its corporate parent, which handles AESLICs claims, in connection with their joint conduct and contractual breaches, including failure to pay more than Five Hundred Thousand and 00/100 Dollars ($500,000.00) in direct losses following a devastating fire at SSPI's

1

seafood processing plant on June 5, 2020 (the Fire).   The SSPI plaintiffs seek direct, and consequential damages for defendants' breaches of contract (Count I); damages under VA Code Ann. § 38.2-510 (Unfair claim settlement practices) for defendants' repeated violations (Count II); a declaration that as a result of its inequitable conduct, AESLIC is estopped from seeking subrogation (Count III), and an award of attorneys' fees for defendants' lack of good faith in denying and refusing to make payment to plaintiffs as determined by the Court at the case's conclusion pursuant to Va. Code Ann. § 38.2-209.

## PARTIES

2.      Plaintiff, Sustainable Sea Products International, LLC (SSP), is a limited liability corporation incorporated in the state of Florida, with a principal place of business in Richmond, Virginia and is the corporate parent of plaintiffs, SSPI Mid-Atlantic LLC (SSPMA) and SSPI Real Estate Holdings LLC (SSPRE).

3.      Plaintiff, SSPI Mid-Atlantic LLC, (SSPMA) is a limited liability corporation incorporated in the state of Virginia, with a principal place of business at 1508 Brook Road, Richmond, Virginia.

4.      Plaintiff, SSPI Real Estate Holdings LLC (SSPRE), is a limited liability corporation incorporated in the state of Virginia, with a principal place of business at 1508 Brook Road, Richmond, Virginia.

5.      Defendant, American Empire Surplus Lines Insurance Company (AESLIC) is an Ohio domiciled surplus lines insurance company (NAIC No. 35351), with its principal place of business in Cincinnati, Ohio.

6.      Defendant American Financial Group, Inc. a/k/a Great American Insurance Group (GA), is a public corporation incorporated in the state of Ohio with a principal place of business in Cincinnati, Ohio, and is the corporate parent of AESLIC.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C § 1332(a)(2) with respect to this Complaint because the citizenship of the plaintiffs is diverse from that of the defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b) (2), as a district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## FACTUAL BACKGROUND

9.      In 2017, SSPI acquired Dickies Seafood, a local Richmond Virginia company and brand which has been in business for over forty (40) years making and selling cooked shrimp, crab and par cooked fish filet products to grocery chains and stores.

10.     By the Spring of 2020 SSPI had three separate production lines in its building focused on steaming shrimp, baking, and freezing crab products, and par cooked and frozen fish filet products.

11.     In late 2017 in an effort to expand its product line and attract new customers, SSPI decided to develop a breaded, par-cooked fish filet product, and purchased and subsequently had professionally installed a self-contained fry line at its facility at 1508 Brook Road, Richmond Virginia, SSPI's base of operations, at a cost of nearly $1 million.

12.     Beginning in 2018, SSPI began to test the fry line, occasionally at first, and over time in 2019 and 2020 for limited duration runs (a few hours) over one or two and eventually three days a week by the spring of 2020.

13.     The new Dickies fish filet product was well received by SSPI existing customers and was the lynch pin of SSPI's successful effort to cement and expand its nascent relationship with a nationally recognized chain of high-end grocery stores by the end of May 2020.

14.     As of early 2020, SSPI's investment had begun to pay off.  Dickies Seafood was profitable, and had, over 3 years, grown its product distribution to almost 150 Food Lions, Kroger locations and independent retailers.

15.     The commencement of the Covid-19 pandemic in March of 2020 with a shift to home-based food consumption was a significant boon to Dickies Seafood's business.  For example, its business with Food Lion (a new customer in November 2019) expanded faster than anticipated, and by Spring, Dickie's products were getting into approximately 50 stores, with a new customer, Whole Foods also expanding its orders.

16.     Although not reflected in its initial 2020 budget projections prepared prior to the start of Covid-19, SSPI's principals anticipated that its sales would explode during the second half of 2020.

17.     In May of 2020 Dickies received approval to expand into 94 Whole Food Locations as well as 12 Additional Food Lion locations

18.     At this time, SSPI anticipated that with the anticipated revenues from its new fish filet product line, and the dramatic increase in its distribution of its steamed shrimp and crab products to Whole Foods and other stores, that SSPI's annual revenue would within the year likely double from approximately $7 million to $14 million per year.

19.     Since it acquired Dickies Seafood in 2017, through April 2020, SSPI's Richmond, Virginia property was insured under annual "blanket" policies issued by different insurers to SSPI's then managing agent, Global Blue Technologies.  Such policies provided property insurance at 1508 Brook Road, as well as on other locations, in other states owned by affiliated entities. SSPI suffered no losses and submitted no claims with respect to the Richmond facility prior to the June 5, 2020 fire.

20.     In early 2020, Global Blue Technologies decided to separate certain aspects of the management of its affiliated entities, including the purchase of property insurance for the SSPI plaintiffs.  As a result, in January 2020, SSPI sought to insure its business at 1508 Brook Road on a stand-alone basis and requested such coverage from its insurance broker.

21.     Defendant, GA, sells insurance through a variety of different insurance companies it owns and controls, including AESLIC, and GA employees provide claim handling services to AESLIC and other GA insurers through certain unincorporated business divisions, including Great American Risk Services, which provided claim handling services to AESLIC with respect to SSPI's claims.

**AESLIC and GA's Contractual Promises To SSPI**

22.     GA proposed insuring SSPI's business via AESLIC, and the parties agreed to a contract of property insurance effective April 10, 2020, pursuant to Standard Fire Policy number 20CP0224699 (the AESLIC Policy) issued to "Sustainable Sea Products International LLC and its subsidiaries," a true and correct copy of which is attached as Exhibit A to this Complaint.

23.     Like most new insurance policies, the actual policy issuance (delivery) is delayed for weeks or months following its effective date.  Indeed, in this instance, the GA Policy was not received by SSPI until nearly two weeks after the June 5, 2020 fire.

24.    Pursuant to the AESLIC policy, defendants agreed to provide the following principal insurance coverages to SSPI:

| Coverage | Prem. # | Bldg. # | Limit Of Insurance | Covered Cause Of Loss | Coinsurance | Valuation |
|---|---|---|---|---|---|---|
| Bldg | 1 | 1 | $1,500,000 | Special | Nil | Replacement Cost |
| BPP | 1 | 1 | $50,000 | Special | Nil | Replacement Cost |
| Tenant Improvements & Betterments | 1 | 1 | $200,000 | Special | Nil | Replacement Cost |
| BI | 1 | 1 | $2,000,000 | Special | Nil | Actual Loss Sustained |
| EDP | 1 | 1 | $25,000 | Special | Nil | Replacement Cost |
| Tools & Equipment | 1 | 1 | $975,000 | Special | Nil | Actual Cash Value |

Ex. A, AESLIC Policy, Coverages Provided and Location

25.    In addition to these coverages, in the event of a loss in which the insured was otherwise entitled to replacement cost coverage, AESLIC further agreed to provide SSPI up to an additional One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) for increased costs associated with compliance with building ordinances and laws.  Ex. A, AESLIC Policy, Coverages Provided, Ordinance and Law; Building and Personal Property Coverage Form, 4. Additional Coverages, e. Increased Cost of Construction.

26.    The Coverage identified on the preceding chart as "BI" refers to AESLIC's "Business Income and Extra Expense Coverage" provisions reflected in policy form CP 00 30 10

6

12 which included the following promise by AESLIC and GA with respect to SSPI's loss of business income as a result of a fire:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at [the insured] premises [.]

Ex. A, Business Income (And Extra Expense) Coverage Form

27.     The period of restoration as defined under the policy imposes a duty on both parties of "reasonable speed" in responding to the loss, or alternatively, imposes a duty on AESLIC and GA to process the insured's claims "as quickly as possible" in connection with the reconstruction of the premises.  See Exhibit A, AESLIC Policy, Business Income (and Extra Expense Coverage)

28.     Under the Extended Business Income provisions of the AESLIC Policy, coverage for business income is extended beyond the period of restoration for up to an additional 60 days.

29.     The second part of this "Business Income (and Extra Expense) Coverage relates to the extra costs the insurer will pay for to get the insured back in business after a catastrophic loss. Specifically, AESLIC promised SSPI as follows:

> We will pay Extra Expense…to:
>
> (1) **Avoid or minimize the "suspension" of business** and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.
>
> (2) Minimize the "suspension" of business if you cannot continue "operations".

30.     These important BI Coverages in the AESLIC Policy, constitute a contractual promise by the insurer (in this case AESLIC) to act promptly, reasonably, and in good faith, and without violating Virginia's Fair Claims Settlement Practices Act VA Code Ann. § 38.2-510, in

adjusting and paying business income claims, a promise that every commercial entity purchasing insurance (like SSPI) expects and relies upon.

31.     This essential promise between business insurer and the insured business can be described as follows:

> In the event of a covered fire which destroys the insured's business, the insurer will promptly pay for the damaged property and promptly pay the income which the insured would have earned or other extra expenses under the policy, **while the fire damages are being repaired at the insurer's expense, all in order not to destroy the property and livelihoods of the owners and workers in such businesses.**

32.     These essential stated and implied BI promises by property insurers to their commercial insureds including those stated in and arising from the AESLIC Policy, reflect that, both SSPI on the one hand, and GA and AESLIC on the other,  understood at the time of contracting, that in the event of a breach of contract and/or absence of timely good faith performance by GA and AESLIC, the very existence of SSPI, and its future profits and opportunities would be in jeopardy, thereby making GA and AESLIC responsible for the consequences of their breaches of express and implied contractual promises.

### The June 5, 2020 Fire

33.     On June 5, 2020, at approximately 11 pm, the fire department responded to a report of smoke, in the area at or near Brook Road in Richmond, Virginia, and upon arrival observed smoke from the roof of the premises.  Upon forcing entry to the building, firefighters confirmed a substantial fire was in progress at 1508 Brook Rd. (the Fire), which destroyed plaintiffs' property and the equipment used in SSPI's successful and growing seafood processing and sales business.

34.     The Fire and the resulting devastating loss to SSPI was reported to AESLIC and GA on June 6, 2020.

8

SSPI's inventory of seafood products was separately insured by a separate and unrelated insurance company which advanced 50% of the loss to SSPI within 35 days after the loss and paid the remainder of the claim without delay or dispute, completely resolving their claim with SSPI on this June 5, 2020 loss by August 2020, prior to AESLIC paying a penny to SSPI.

### GA And AESLIC's Bad Faith Conduct And Contractual Breaches

35.     Insurers like AESLIC ordinarily conduct in person, on-site visits when issuing property insurance on a new location for the first time, permitting the insurer through its "Loss Control" business unit and the new insured to work together to reduce risk, or as GA puts it:

> At Great American, not only do we take loss control seriously, but we also offer a customer-centric approach to service, enabling insureds to operate in a safer environment while keeping their core business operations as their first priority.

36.     In this case, GA, through its "Loss Control" business unit, chose to conduct a telephone "visit" rather than its usual in person inspection, and this telephone conference with SSPI took place on June 1, 2020.

37.     GA's Loss Control survey report, issued after the Fire, on June 24, 2020 confirmed that the purpose of its inspections was to "gather information concerning [SSPI's] operations, review your past loss history, discuss safety practices in place and to survey the premises to identify actual and potential sources of loss."  Notably this Loss Control inspection noted only a single issue (fire extinguishers should be placed where needed according to the building codes (code compliant extinguishers existed at all times) and raised no issues with SSPI regarding protective systems or their maintenance or any other aspect of SSPI's seafood processing operations.

38.     The universal custom and practice in the property insurance industry after any significant loss, consistent with the express and implied BI obligations noted herein, is for the

insurer to provide the insured with periodic substantial financial "advances," i.e. payments of loss the insurer and insured expects will be owed under the policy, long before the fire related damage to the building and equipment and loss of income is complete, or even fully assessed.

39.     AESLIC knew, prior to contracting, that SSPI was a single location seafood manufacturing and sales business, and that as such, that timely substantial advances were critical to SSPI's survival and to minimizing its BI losses, which would allow SSPI to retain key employees, and to plan for its future.

40.     On or about June 7, 2020, GA adjuster Mark Miller contacted SSPI and offered SSPI an advance asking the insured to simply identify how much was initially needed and to provide SSPI's wiring instructions for the payment.  GA confirmed the offer of an advance in writing on June 8, 2020.

41.     SSPI initially requested an immediate advance of Fifty Thousand and 00/100 Dollars ($50,000.00) for its operations, however, unilaterally, and without further explanation AESLIC refused to make any advance and continued its refusal for more than two and a half months until August 25, 2021, all to the detriment of the potential recovery of SSPI's business.

42.     During this time, and as a direct result of GA and AESLIC's conduct, SSPI lost key employees, and was forced to lay off others, and did not know whether it would be able to survive.

43.     On June 10, 2020, GA and AESLIC, through their agent Sedgwick sent SSPI a letter with an enclosure seeking extensive documentation.  In addition to requesting numerous documents relating to SSPI's anticipated BI claims which would not be fully realized until the building and all equipment were returned to their pre-loss condition.  GA and AESLIC initially requested such documentation at SSPI's "earliest convenience."

44.     One day later, June 11, 2020, Sedgwick, on behalf of GA and AESLIC, again requested information and documents, this time requesting that they be produced the very next day:

> A few of these questions are duplicates from our discussion and request for information sent the other day, <u>however it has now become much more urgent we obtain answers to the below specific questions as soon as possible. We would like to get answers to these questions by tomorrow if possible.</u>

45.      On June 10, 2020 SSPI began its production of the requested documents and information with a copy of lease documentation.  On June 26, 2020, it produced the contract for the installation of the fry line to AESLIC.  Additional documents have been continuously provided by SSPI, its counsel and SSPI's public adjusters, Young & Associates, Inc. as set forth on the attached summary of documentation submitted.  Exhibit B, Summary of Documents Submitted.

46.     By June 16, 2020, hearing nothing from GA/AESLIC, SSPI became concerned as to why it had not received the proffered advance and asked its insurance broker who advised that representatives of GA and AESLIC were now refusing to provide any advance and would pay nothing until after SSPI submitted its claim.

47.     SSPI realized that the abrupt change in attitude by AESLIC, GA, and their agents, followed a walk-through of the fire damaged plant by the insurer's adjuster in which AESLIC's adjuster asked questions about fire suppression systems and duct work on certain plant equipment.

48.     With SSPI's business decimated from the Fire, and with GA and AESLIC refusing to respond to SSPI's request for an advance, SSPI sought legal advice, retained coverage counsel and advised GA and AESLIC to direct all further contact to such counsel.

49.     On June 17, 2020, contrary to its prior statements to SSPI's broker, GA's Mark

Miller stated that SSPI's request for an advance was "under consideration," and continued to

misrepresent SSPI's cooperation and production of requested documentation:

> We are evaluating your request for an advance payment.  As the investigation and
> evaluation of the claim, including coverage, is underway, we are not prepared at
> this time to issue any advance payment.  **We are giving your request serious
> consideration, however, and intend to follow-up with you further on the
> matter, <u>once our initial investigation is complete</u>.**
>
> There is a scheduled joint inspection for all involved parties and their experts on
> June 24-25. You are more than welcomed to bring in experts of your own choosing
> to participate, at your own expense. If you choose to do this, please contact our
> subrogation counsel Matthew McLain at 815-530-███.
>
> **<u>Lastly, we are still waiting on your response to Michael Blaseg's 6/10/20
> Request for Information (RFI) letter and his 6/11/20 follow up e-mail.</u>** It is
> important to provide all of the requested information at your earliest convenience.

The email concluded with AESLIC generally reserving its rights, without stating which policy

provisions or other rights it was reserving.

50.     In other words, while ignoring its insured's critical need for funds, GA/AESLIC

advanced their own subrogation interests.

51.     SSPI, through counsel, formally responded to GA on June 17, 2020, noting SSPI's

prior production of certain information and documents requested and SSPI's intent to continue

producing documents made more difficult by Covid-19, the fire and GA's conduct to date,

including its refusal to make timely advances. SSPI's counsel requested that the parties agree to

confidentiality regarding all of SSPI's submissions and that all further contact from GA/AESLIC

be routed through counsel.  See Ex. C, Correspondence to GA/AESLIC dated June 17, 2020.

52.     By that time, GA through its subrogation counsel and based on SSPI's ongoing

cooperation, had already identified third parties it believe may have caused or contributed to the

loss and sent detailed letters advising such third parties of their potential liability and inviting them to participate in an investigation of the fire site over two days on June 24 and June 25, 2020.

53.     Before and after that time, SSPI took numerous steps to coordinate with GA's counsel the scheduled site inspection, with counsel for both SSPI and GA/AESLIC jointly preparing a protocol for the inspection to be agreed by all participants, and the June 24-25, 2020, site inspection proceeded without incident.

54.     On June 22, 2020, Sedgwick's Michael Blaseg, on behalf of GA/AESLIC wrote directly to SSPI's CFO (cc-ing SSPI's counsel) and forwarded the previous document requests to SSPI and requested a conference call but did not address SSPI's request for confidentiality regarding its production.

55.     SSPI's counsel responded on June 23, 2020, noting its prior request that all communications be directed to counsel, reiterating its request for confidentiality, and noting that SSPI was ready to begin the transfer of additional documentation requested by GA/AESLICI.

56.     That evening, after business hours, GA directed an eight (8) page single spaced letter to SSPI's counsel quoting many policy provisions, including provisions regarding cooperation, and the so-called Protective Safeguards provision of the AESLIC Policy among many others.  The letter did not in any way explain why such provisions were being noted, or how such provisions impacted SSPI's claim or requests for an advance.  The letter did not address SSPI's repeated requests for confidentiality.

57.     The same evening outside counsel for AESLIC/GA, Robert Reverski sent a second correspondence to SSPI's counsel again quoting policy provisions and falsely accusing SSPI of failing to cooperate with the site inspection by misrepresenting SSPI's position.  As with its prior correspondence there was no explanation regarding why GA/AESLIC was refusing to provide an

advance or otherwise describing any conduct by SSPI which was believed to be at issue in connection with the loss.

58.     In a responsive email sent to Attorney Reverski, on June 24, SSPI's counsel noted:

One point I must address however is your inaccurate statement that I "have instructed Great American and its representatives not to ask your Insured questions at the joint site inspection." I negotiated a joint protocol with your client's subrogation counsel, Matthew McLean, copied above, during which both parties agreed in writing that all questions during the Joint Examination (which included questions from numerous potential litigation adversaries of AESLIC if subrogation is found) would be submitted in writing for subsequent response.

Any assertion that in reaching such an agreement with AESLIC counsel regarding its subro investigation that questions would be accepted in writing for subsequent response that we have somehow prejudiced AESLIC's investigation is both wrong and offensive. ...My understanding is that Attorney McLean has been satisfied, indeed appreciative (and in writing) with our efforts at cooperation including the negotiation of the joint protocol, through the present time. **By way of cc to him, if Attorney McLean believes SSPI has been uncooperative or has prejudiced his investigation to date, I request that he immediately detail such circumstances, and explain the purported prejudice now so that any issues identified can be appropriately addressed, and in advance of tomorrow's continued examination.** I would also request that you retract the comment regarding my statement and any assertion of alleged prejudice based on it.

59.     Not surprisingly Attorney McLean never disputed that SSPI had cooperated, and GA/AESLIC never acknowledged its error or corrected its misrepresentation thereby establishing that Attorney Reverski had recklessly and/or knowingly misrepresented such facts on behalf of GA/AESLIC.

60.     Under Virginia law, an insurer cannot rely on a protective safeguards endorsement as a means of disclaiming coverage, unless the insureds conduct with respect to such safeguards caused or contributed to the loss.

61.     After the site inspection, and by no later than June 29, 2020, GA's subrogation counsel in an email forwarded to SSPI's broker indicated that GA had concluded that SSPI's conduct was not involved in the loss:

All three of our subrogation targets are contractors who were involved in the buildout of the property in 2018. **We believe <u>the evidence we have obtained also serves to exculpate the insured from liability even under the stringent 1% contributory negligence standard in Virginia</u>.**

62.     Thus, AESLIC and GA had admitted by June 29, 2020 that AESLIC and GA had no basis to assert its coverage defense of protective safeguards, and thus no basis to withhold advances to SSPI, nevertheless, GA and AESLIC continued to misrepresent the nature and conclusions of its investigation and its coverage to SSPI and continued to assert this bogus defense causing SSPI to incur substantial legal fees until at least August 25, 2020 when it made its first advance and on repeated occasions thereafter.

63.     GA and AESLIC's continued refusal to acknowledge coverage to SSPI and to continue to withhold claim payments and advances for two months was in all respects unreasonable, as reasonable minds could not (and did not) differ in concluding that the insured's conduct was not involved.  AESLIC's continuing "investigation" was therefore a sham and a means of further delaying AESLIC's coverage obligations and thus GA/AESLIC failed to conduct a reasonable good faith investigation.

64.     Although GA's own internal investigation had concluded that SSPI had no involvement in causing the loss by no later than June 29, 2020, GA and AESLIC continued to assert a coverage defense based on the Protective Safeguards Endorsement until at least August 25, 2020.

65.     On July 8, 2020, subro counsel for AESLIC advised that GA/AESLIC had authorized him to continue his subrogation investigation and thus needed to request further cooperation from SSPI, which was provided.

66.     SSPI's inventory insurer also attended the June 24-25 joint inspection and completed a report dated July 10, 2020, which included the following statements:

On Wednesday, June 24, 2020, we attended the joint investigation of the SSPI fire casualty. According to the joint inspection sign-in sheet, thirty-one (31) persons were in attendance. The group was comprised of fire consultants, forensic engineers, electricians, equipment (cooking, ventilation, refrigeration, food processing) technicians, roofing engineers, attorneys, and adjusters.

At 1308 hours, the investigators decided to cut openings in the grease and combustion exhaust ducts, which were located on the roof to view their interior condition. They also planned to remove panels in the fryer unit.
...

The cutting of openings in the grease and combustion exhaust ducts was deferred to the following day.

We returned to the SSPI facility on June 25, 2020. At 0936 hours, openings were cut in the grease and combustion exhaust ducts on the roof. There did not appear to be excessive grease in the ducts or any apparent signs of heat or fire damage. Accumulated grease was found in the grease exhaust motor and vent. The investigators took samples of the grease.
...
A final determination as to the cause of the fire is still pending. However, it appears the fire may be linked to the installation of the vent system by one or more of the contractors who performed the install.

Ex D, Inventory Insurer's Report (emphasis added).

67.     As a result of this report, the insurer agreed to pay 50% of its liability less than two months after the Fire and paid the remainder of its loss within three months thereafter.

68.     A copy of the inventory insurer's report was provided to GA/AESLIC on or about July 15, 2020 and provides objective evidence of what good faith claims handling by a property insurer should be, in contrast to the continuing bad faith conduct and misrepresentations by GA/AESLIC.

69.     On August 5, 2020, SSPI filed a sworn statement in proof of loss in the amount of One Hundred Forty-One Thousand Nine Hundred Forty-Seven and 08/100 Dollars ($141,947.08) based on an initial invoice for emergency services charged by a disaster recovery contractor, Belfor USA.

16

70.     On August 21, 2020 SSPI requested a Six Hundred Thousand and 00/100 Dollars ($600,000.00) advance from GA.

71.     GA made its first payment, an advance under its "Business Personal Property/Tools & Equipment coverage" on August 25, 2020 for Five Hundred Thousand and .00/100 Dollars ($500,000.00).

72.     On September 30, 2020 SSPI submitted a preliminary business income claim to GA covering operations and projections from the date of the fire to November 2020 in the amount of Six Hundred Ten Thousand and 00/100 Dollars ($610,000.00).  GA, however, waited 30 days before responding substantively, and rather than make an advance simply requested additional documentation, some of which had been in its possession for months.

73.     GA made no payment toward SSPI's business income loss until mid-December 2020, making a payment of approximately 50 % of the amounts claimed.

74.     On December 23, 2020 SSPI submitted additional information in connection with its business income claim through November 2020, showing that SSPI's business income losses during the period were in fact One Million Fifty-Four Thousand Nine Hundred Eighty-One and 00/100 Dollars ($1,054,981.00), and demonstrated losses in excess of coverage for both Electronic Data Processing equipment ($25k limit) and Machinery and Equipment ($975k limit) and made claim for such amount.

75.     In early January 2021, with much of the claim submitted, and with the remainder of the claim including with respect to business income coverage capable of projection, SSPI offered to meet with GA to negotiate a final settlement of the insurance claim, an offer it has made repeatedly, and which has been repeatedly ignored by GA to the detriment of SSPI's business to the present date.

76.    Additional submissions of its business income losses were made in January (for the period ending December 2020, with further submissions shortly after each successive time period.

77.    Although a certificate of occupancy was issued for the building in mid-May 2021, plant equipment was not fully installed, in part because of GA's continuing delay in making payment for such equipment, and as a result the period of restoration continued until the plant's grand re-opening on August 5, 2021, with the GA Policy extending the period of restoration for an additional 60 days until October 5, 2021.

78.    Throughout this time, GA continued to make advance payments insufficient to address SSPI's losses, falsely claiming that the issuance of a certificate of occupancy for the building meant the end of the period of restoration and claiming that GA/AESLIC needed counsel to research whether the policy (in both parties' possession since June of 2020) included a 60 day extension to GA business income coverage.

79.    GA initially failed to even identify the basis for its position and continues to the present time to refuse to negotiate with SSPI.

80.    On February 26,2020, SSPI's public adjuster explained that documented losses which exceed limits in one coverage category should instead be applied to others:

> The excess over the policy limits of the EDP which approximates $4781 could be applied to BPP which has a limit of $50,000. This amount plus the $16,305 plus the $20,000 that was marked from Belfor would bring the personal property loss up to $41,086.
>
> In regard to the tools and equipment while there is a limit of $975,000 which $500,000 was paid leaving a balance of $475,000 the excess amount of damage could be put into the building because if you read the policy as it defines building it refers to items that are permanently installed including machinery and equipment. There is certainly more than $300,000 worth of machine and equipment that is permanently installed.
>
> By doing what I have suggested would not cost the carrier any additional monies since they have agreed to pay the policy limit on the building which

is $1,500,000.  To date the carrier have paid 1,036,333.82 on the actual cash value plus $220,000 on Belfor mitigation for a total of $1,256,333.82 which would leave a balance of approximately $243,666.18 available.  This amount is less than the holdback for depreciation which is $259,503.84. These above steps would bring complete resolution to the building, personal property machinery and tool as well as EDP leaving only the loss on income to discuss.

81      In the same correspondence, SSPI's public adjuster noted:

To date the carrier has paid what they believe the loss of income is up to December 31,2020. We would appreciate when we can expect January and we will be submitting February early next week.  It is important to have these funds available in order to keep our people and be ready to open as soon as everything is complete. It should be noted that while we are not in agreement with the calculation as it appears that the difference is all in the trend. I believe a conference call with the insured and your accountant and myself this can be resolved.  I 'm not sure your accountant is aware of new clients that the insured was able to bring on.

82.     Notwithstanding this and many similar communications, GA refuses to pay certain documented losses and or to discuss the parties' differences and/or to negotiate outstanding business income claims.

83.     Indeed, its current position is that the entirety of the loss remains "under investigation" and subject to demands for additional documentation as a pretense for avoiding its contractual obligations.

84.     From the time it initially refused to advance funds, GA and AESLIC continued their unwarranted and improper "investigation" and made no payments or advances to SSPI under any of the AESLIC coverages until its August 25, 2020 advance, and thereafter continued to act in bad faith and in breach of their contractual and statutory obligations in at least the following respects:

a. continuing to make repetitive and unwarranted demands for documentation many of which had previously been satisfied.

b. misrepresenting its knowledge regarding the nature and extent of extended business income coverage in the AESLIC;

c.  falsely asserting that the insured must continuously document immediate financial consequences before paying business interruption claims or providing additional advances;

d.  failing or refusing to respond to repeated requests for payment and/or explanations regarding GA's position;

e.  withholding information regarding negotiations or side agreements between GA and vendors hired by SSPI, thereby delaying necessary claim supplementation by SSPI;

f.  refusing to timely pay advances and amounts due under the policy.

85.    As a result of the Fire, and the conduct of GA and AESLIC, and the circumstances impacting supply chains following the fire, SSPI is entitled to Business Income coverage including Extended Business Income under the AESLIC Policy from June 5, 2020, until at least October 5, 2021, as set forth in the AESLIC policy.

## COUNT I
## BREACH OF CONTRACT AGAINST AESLIC-DIRECT
## AND CONSEQUENTIAL DAMAGES

86.    Plaintiffs incorporate the preceding paragraphs as if expressly restated here.87.

Plaintiffs through their public adjuster submitted claims to the defendants through informal submissions and partial and eventually final proofs of loss.  When it became clear after months of effort by SSPI that AESLIC and GA, without explanation, would withhold payment in excess of Five Hundred Thousand and 00/100 ($500,000.00) in business income and other coverages which had been fully documented and the subject of prior payments or advances, SSPI was forced to submit final proofs of loss to AESLIC on September 20, 2021. totaling Four Million Six Hundred Sixty Thousand Four Hundred Thirty-three and 72/100 Dollars ($4,660,433.72).  See Exhibit E, Claim Summary and Final Proofs of Loss.

88.     Defendants have failed to pay Five Hundred Forty-Five Thousand Five-Hundred Seven and 81/100 Dollars ($ 545,507.81) which is now due under the AESLIC policy and are therefore in breach of their contract in addition to their liability for unfair claims practices.

89.     As both parties understood at the time of contracting that the consequences of delayed payments and non-payments by AESLIC following a fire would cause additional harm to SSPI in the form of reasonably anticipated lost profits, and the destruction of SSPI's business, SSPI is entitled to consequential damages in an amount to be determined.

<u>**COUNT II**</u>
**UNFAIR CLAIM PRACTICES (VA Code Ann. § 38.2-510)**

90.     Plaintiffs incorporate the preceding paragraphs as if expressly restated here.

91.     Virginia law prohibits certain insurance claim practices pursuant to VA Code Ann. § 38.2-510 including the following acts and practices undertaken by AESLIC and GA as detailed herein:

> 1. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
>
> 2. Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
>
> 3. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
>
> 4. Refusing arbitrarily and unreasonably to pay claims;
>
> 5. Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
>
> 6. Not attempting in good faith to make prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
>
> 7. Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;
> ...

8. Attempting to settle claims on the basis of an application that was altered without notice to, or knowledge or consent of, the insured;

9. Making claims payments to insureds … not accompanied by a statement setting forth the coverage under which payments are being made;
…
10. Delaying the investigation or payment of claims by requiring an insured… to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, when both contain substantially the same information;

11. Failing to promptly settle claims where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

12. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement[.]

VA Code Ann. §38.2-510

92.     As a result of defendants' unfair claim practices, the SSPI plaintiffs suffered additional losses, including lost profits, and AESLIC and GA should pay for their statutory violations.

93.     Although violations of VA Code Ann. § 38.2-510 do not in and of themselves create a private cause of action, it does not bar such claims where plaintiffs like SSPI have a right to seek redress at law or equity for any conduct for which action may be brought, including AESLIC's contractual breaches set forth herein.


## COUNT III
## DECLARATORY JUDGMENT-DEFENDANTS HAVE NO RIGHTS TO RECOVER INSURANCE PAYMENTS FROM THIRD PARTIES

95.     Plaintiffs incorporate the preceding paragraphs as if expressly restated here.

96.     Under Virginia law and equitable principles, a party obligated to pay moneys to another may recover such moneys from a third party responsible for causing the loss for which moneys were paid, once the party suffering loss has been made whole in a process known as subrogation.

97.     Where the party seeking subrogation has acted inequitably, the Court may in the exercise of equity deny such subrogation rights.

98.     As a result of defendants' inequitable conduct as described herein, the SSPI plaintiffs are entitled to declaratory relief invalidating or otherwise impacting any rights of recovery against third parties which may otherwise have been available to AESLIC.

## REQUEST FOR ATTORNEYS' FEES
## FOR DEFENDANTS' BAD FAITH PURSUANT TO Va. Code Ann. § 38.2-209

99.     Plaintiffs incorporate the preceding paragraphs as if expressly restated here.

100.    Va. Code Ann. §38.2-209, in pertinent part provides that:

> [I]n any civil case in which an insured … sues his insurer to determine what coverage, if any, exists under his present policy … or the extent to which his insurer is liable for compensating a covered loss, the … insured shall be entitled to recover from the insurer costs and such reasonable attorney fees as the court may award …[if] the court determines that the insurer, not acting in good faith, has either denied coverage or failed or refused to make payment to the insured under the policy.

101.    At all relevant times, GA and AESLIC have not acted in good faith in failing and/or refusing to make payments to the insured under the policy, thereby entitling the SSPI plaintiffs an award of attorneys' fees and costs as determined by the Court.

## PRAYER FOR RELIEF

The SSPI plaintiffs respectfully request Judgment as follows:

A.  Direct damages against the defendants in the amount of Five Hundred Forty-Five Thousand and 00/100 Dollars ($545,000.00);

B.  Consequential damages against the defendants as determined by the fact finder;

C.  Damages at law and in equity for defendants' statutory violations and unfair claim practices under VA Code Ann. § 38.2-510 against each defendant for each unfair claim practice committed jointly or severally by the defendants;

D.   A declaration that as a result of their respective inequitable conduct neither defendant may proceed against third parties in subrogation either directly in their own right or as an assignee of the insureds rights against such parties;

E.   Attorneys' fees pursuant to VA Code § 38.2-209 against each defendant for not acting in good faith by either denying coverage or failing or refusing to make payments due the insured under the policy as determined by the court at the conclusion of the case;

together with such further or additional relief as is warranted under the circumstanced and applicable law.

Respectfully submitted,

_____/s/_____
Terrence L. Graves #32705
Sands Anderson PC
Bank of America Center
1111 East Main Street, Suite 2400
P.O. Box 1998
Richmond, VA 23218-1998
(804) 783-7276
tgraves@sandsanderson.com


Of counsel, pro hac admission to be requested

Joseph S. Sano, BBO #545706
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
jsano@princelobel.com
617-456-8000